U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2015 AUG 31 PM 2: 14

CLERK
BY _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 5:15-cr-66-01 |
| ) | |
| ANTONY GOMEZ-LOTERO, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER RE:
## DEFENDANT'S MOTION TO SUPPRESS
(Doc. 12)

Defendant Antony Gomez-Lotero was charged by indictment with attempt to transport an alien within the United States in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) after Border Patrol agents stopped and questioned Gomez-Lotero twice as he was driving in Highgate, Vermont near the Canadian border. Gomez-Lotero moves to suppress all evidence obtained as a result of the stops on the ground that Border Patrol agents had no reasonable basis for suspicion that Gomez-Lotero was attempting to traffic an undocumented alien. For the following reasons, Gomez-Lotero's motion to suppress is DENIED.

### I.    Background

The following facts are drawn from the affidavit of Border Patrol Agent Andrew Bookout, the parties' motions, and the testimony at the hearing on August 20, 2015. These facts are determined for the purpose of Gomez-Lotero's suppression motion only.

Border Patrol Agent Brian Rossi was patrolling Highgate, Vermont, in the early morning hours of April 26, 2015. Agent Rossi's patrol route took him down St. Armand Road, which intersects with Ballard Road 1.8 miles south of the U.S.-Canadian border. Ballard Road is a short dirt road which runs north-south between St. Armand Road and the Canadian border. At its northern terminus, Ballard Road comes to a dead-end at a small wood 100 yards south of the border. After a short stretch of grass and brush, the road resumes on the Canadian side as Chemin Bradley. At its southern end, Ballard Road terminates at St. Armand Road, from where

a driver on Ballard Road could turn west (right) toward Route 7 or southeast (left). The intersection is essentially T-shaped. There is a stop sign for traffic on Ballard Road only.

Around 1:30 a.m. on April 26, 2015, Agent Rossi observed a BMW sedan. The car was stopped at the intersection of St. Armand Road and Ballard Road. It displayed a New Jersey license plate. Agent Rossi testified that the car was parked in an unusual way at the intersection. The car was not positioned in a perpendicular fashion to St. Armand Road, as though it were stopping at the stop sign before turning left or right onto St. Armand Road. Instead, the car was oriented parallel to St. Armand Road, its headlights shining west. As Agent Rossi drove past the BMW in his marked patrol car, the BMW began driving west on St. Armand Road.

Agent Rossi testified that Ballard Road is typically devoid of traffic after 10:00 p.m. Only ten houses sit on Ballard Road, so traffic is also typically limited to the residents of those houses. Agent Rossi testified that illegal aliens are apprehended on Ballard Road and surrounding areas approximately once per month.

Recalling that "several smuggling events" had occurred in the area "in the recent past," Agent Rossi made a U-turn and followed the BMW sedan as it turned west onto St. Armand Road. (Doc. 1-1 at 1.) He ran the license plate, and found that the sedan belonged to a Mr. Gomez-Lotero of Paterson, New Jersey. Agent Rossi stopped Gomez-Lotero just after he had turned north onto Route 7 from St. Armand Road.

Gomez-Lotero told Agent Rossi that he was "there to pick up a friend from Canada but could not find him." (Doc. 13 at 2.) There were no passengers in the sedan. Gomez-Lotero permitted Agent Rossi to search his trunk—there was nothing of significance in it. Meanwhile, Gomez-Lotero had begun speaking with somebody over his cell phone in Spanish. Agent Rossi did not know the language but made out the utterance "policía." As Agent Rossi approached, Gomez-Lotero ended his phone call, explaining that the call was dropped. "He told Agent Rossi that he was going to drive back to I-89 to see if reception was better." (*Id.*) Agent Rossi released Gomez-Lotero from the stop.

As Gomez-Lotero drove away, two other agents followed him at a distance. Agent Rossi returned to Ballard Road, drove to its northern end, and parked. Agent Rossi got out of his car and began walking north toward the border, scouting the grassy and woody area ahead with

2

night-vision goggles. Through his goggles Agent Rossi saw a man with a suitcase. He approached the man. Bits of grass and brush clung to the man's suitcase and clothing—"as if he had just walked through the wooded area between Canada and the United States," Agent Rossi observed. (*Id.*)

Agent Rossi told the man that he was a U.S. Border Patrol Agent and then asked him about his immigration status. The man told Agent Rossi that he was Dominican and had permission to be in Canada. "[You're] in the United States," Agent Rossi said. (*Id.*) He asked the man again whether he had permission to be there. The man "conceded that he did not have documents allowing him" to be in the United States. (*Id.* at 3.)

Agent Rossi asked the man for identification, and he produced both a Dominican and an Italian passport. The Dominican passport identified the man as Zenon de Jesus Rosario, and his Italian passport was in the name of Zenon Rosario. Both passports listed "the same 1965 date of birth and contained photographs of" the man. (*Id.*) Agent Rossi's record checks of those names revealed no criminal history. However, after the man was transported to the Swanton, Vermont Border Patrol Station, his fingerprints revealed him to be Juan Antonio Bueno, from the Dominican Republic. Bueno had been convicted of felony distribution of cocaine in the United States and was deported in 1998. (Doc. 1-1 at 2-3.) Agent Rossi arrested Bueno.

After Agent Rossi arrested Bueno, he told the agents who had been following Gomez-Lotero. These agents then stopped Gomez-Lotero. The agents told Gomez-Lotero "that his 'friend' had been found, and was an illegal alien." (*Id.*) Gomez-Lotero was brought to the Swanton Border Patrol Station, where he waived his *Miranda* rights and told agents that he had agreed to pick up an unknown man from Canada on Ballard Road in exchange for $200. (Doc. 1-1 at 3.) He was supposed to pick the man up at 12:30 a.m., but could not find him. Gomez-Lotero allowed agents to view his cell phone, which contained text messages "indicating that he was in the area as part of an alien smuggling venture." (*Id.*)

3

## II.     Suppression Standard

Within a "reasonable distance" from the U.S. border,[1] immigration officers may seize a person consistent with the Fourth Amendment on less than probable cause to believe a criminal offense has been committed. *United States v. Brignoni-Ponce*, 422 U.S. 873, 874, 880 (1975); 8 U.S.C. § 1357(a)(3). An officer may stop a car and question drivers and passengers about their immigration status if the officer has a *reasonable suspicion* that "illegal alien trafficking [is] afoot." *United States v. Solomon*, 592 F. App'x 38, 39 (2d Cir. 2015); *see also Brignoni-Ponce*, 422 U.S. at 882. The officer must articulate a "particularized and objective basis for suspecting legal wrongdoing given the totality of the circumstances." *United States v. Singh*, 415 F.3d 288, 294 (2d Cir. 2005). "[A]ny further detention or search must be based on consent or probable cause." *Brignoni-Ponce*, 422 U.S. at 882.

"In examining the totality of the circumstances, officers are entitled to 'draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" *Singh*, 415 F.3d at 294 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). A non-exhaustive list of factors which may give rise to reasonable suspicion includes:

> (1) characteristics of the area where the vehicle is found; (2) its proximity to the border; (3) usual traffic patterns on that road; (4) previous experience with alien traffic in the area; (5) recent information about specific illegal border crossings there; (6) the driver's behavior, such as attempting to evade officers; (7) characteristics of the vehicle itself; and (8) the appearance of persons in the vehicle, such as mode of dress.

*Id.* "[A] requirement of reasonable suspicion for stops allows the Government adequate means of guarding the public interest and also protects residents of the border areas from indiscriminate official interference." *Brignoni-Ponce*, 422 U.S. at 883.

## III.    Analysis

Border Patrol agents stopped Gomez-Lotero on two occasions. The court considers the initial stop on Ballard Road first.

---

[1] Federal regulations define "reasonable distance" as 100 miles or less from the border. 8 C.F.R. § 287.1(a)(2).

4

### A. The Initial Stop

The Government argues that Agent Rossi had reasonable suspicion to stop Gomez-Lotero on Ballard Road based on the following evidence: Gomez-Lotero was driving in upstate Vermont, within miles of the U.S.-Canada border, at 1:30 a.m.; illegal alien trafficking had occurred in the past in that area; his car had a New Jersey license plate; and he was found stopped in an unusual manner at an intersection.

Were the only suspicious factors the time at which Gomez-Lotero was driving and his New Jersey license plate, reasonable suspicion would not be present. *See, e.g., United States v. Cruz-Rivas*, No. 08-14064, 2009 WL 367739, at *6 (S.D. Fla. Feb. 13, 2009) (concluding officer had no reasonable suspicion to justify stopping driver of California-registered minivan at 3:00 a.m. on I-95, "a known highway used by alien smugglers"); *see also United States v. Vega*, No. 14-CR-00153-JJB-SCR, 2015 WL 1726148, at *3 (M.D. La. Apr. 15, 2015); *United States v. Covarrubia*, 911 F. Supp. 1409, 1419 (D.N.M. 1994). Additionally, "[c]areful, lawful driving gives little support to establishing reasonable suspicion." *United States v. Hernandez-Lopez*, 761 F. Supp. 2d 1172, 1189-90 (D.N.M. 2010).

The court recognizes that circumstances establishing reasonable suspicion are often more unusual than those presented here. *See, e.g., Solomon*, 592 F. App'x at 39 (affirming finding of reasonable suspicion where driver of Mitsubishi sedan with two passengers drove in circles in Wal-Mart parking lot near U.S.-Canadian border for fifty-five minutes during which time nobody got in or out of the car, and SUV "dropped off four individuals who immediately got into the smallish Mitsubishi" which then drove off); *United States v. Dusablon*, 534 F. Supp. 1368, 1374-75 (D. Me. 1982) ("The appearance of an unaccounted-for passenger in a station wagon which had just 'given the slip' to [Border Patrol officials] near the border minutes before and which was being driven by a person suspected of participation in a recent walk-around attempt in the same area, . . . prompted an entirely reasonable suspicion that the [defendant's] vehicle was involved in a walk-around."); *see also Singh*, 415 F.3d at 295 (affirming conclusion that reasonable suspicion justified stop where defendant drove slowly on rural road near U.S.-Canadian border, tapped his brakes repeatedly, and picked up passengers near the border).

Here, however, the out-of-state license plate and proximity to the border were supplemented by the unusual manner in which Gomez-Lotero's BMW was parked at the intersection; the fact that the unpaved Ballard Road normally sees only local traffic during the day and no traffic at 1:30 a.m; and the fact that illegal aliens were previously apprehended on Ballard Road. Moreover, the BMW began driving west as Agent Rossi's patrol car drove past it. "A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *Arvizu*, 534 U.S. at 277. The totality of these circumstances entitled Agent Rossi to suspect that alien trafficking activity was occurring. *See United States v. Jacquinot*, 258 F.3d 423, 429-30 (5th Cir. 2001) (concluding that unusual driving behavior and deviation from usual traffic patterns justified stop of truck driver and occupants seventy-five miles from U.S.-Mexico border); *United States v. Samaguey*, 180 F.3d 195, 198-99 (5th Cir. 1999) (affirming finding of reasonable suspicion where defendant "was traveling alone, in an out-of-state car, registered to a female, at an unusual hour, on a road known for illegal activity" and defendant "drove too slowly after spotting the patrol car and may have swerved as a nervous reaction"). Gomez-Lotero's motion to suppress evidence obtained as a result of the initial stop is denied.

### B. The Second Stop

The circumstances surrounding the second stop included all of the factors present preceding the first stop with the addition of Agent Rossi's discovery of Bueno at the northern end of Ballard Road. Bueno—although his true identity was not determined until later—admitted that he possessed no documentation showing he was legally in the country.

The presence of an undocumented alien who had just crossed the border with his suitcase awaiting a ride on the same road on which Gomez-Lotero's out-of-state vehicle had been lingering is a strong indicator of illegal alien trafficking. Since the first stop was justified by reasonable suspicion, it does not provide a basis for exclusion of evidence. The second stop was obviously supported by reasonable suspicion since Agent Rossi had located an illegal entrant waiting to be picked up approximately a mile or less from where Gomez-Lotero had been waiting for his friend. *See United States v. Belanger*, No. 1:08-CR-59-1, 2009 WL 2190377, at *4 (D. Vt. July 13, 2009) (concluding reasonable suspicion justified Border Patrol agent's stop of SUV driving at suspicious speeds in Vermont border town where "sensor activation indicated possible human foot traffic in [the] area where smuggling recently had increased"). Therefore,

Gomez-Lotero's motion to suppress any evidence obtained as a result of the second stop is also denied.

### IV.     Conclusion

For the reasons stated above, Gomez-Lotero's motion to suppress evidence is DENIED.

Dated at Rutland, in the District of Vermont, this 31st day of August, 2015.

_____
Geoffrey W. Crawford, Judge
United States District Court